IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH WAYNE GRAY,<br><br>    Plaintiff,<br><br>  v.<br><br>RONALDO SALAO; TRAMAINE WILLIAMS, TRAVIS SMITH; WILLIAM MUNIZ; BRIAN PETERSON; ROBIN BOCELLA; BELINDA HEDRICK; GARY BIAGGINI; and MELISSA PARK,<br><br>    Defendants.<br>                                              / | No. C 10-03474 WHA<br><br>**ORDER DENYING DEFENDANTS' RENEWED MOTION TO DISMISS** |

## INTRODUCTION

Plaintiff, an inmate at Salinas Valley State Prison in Soledad, filed this civil rights action against defendants under 42 U.S.C. 1983. Defendants now move to dismiss plaintiff's retaliation claim for failure to exhaust all available administrative remedies as required by 42 U.S.C. 1997e(a). Additionally, they seek dismissal for both the retaliation and due process claim pursuant to 12(b)(6). For the reasons stated below, defendants' renewed motion to dismiss is **DENIED**.

## STATEMENT

Plaintiff's original complaint survived screening required by 28 U.S.C. 1915A(a) and was found to have stated cognizable claims of relief against defendants for violating plaintiff's right to due process and his First Amendment rights by retaliating against him for his filing of inmate grievances. After appointment of pro bono counsel, plaintiff filed a first amended complaint

alleging a due process and retaliation claim. Defendants' filed a notice of motion and renewed motion to dismiss. Plaintiff filed an opposition and defendants filed a reply.

On December 15, 2009, defendant Travis Smith searched plaintiff's cell and found a white powder (First Amd. Compl. ¶ 16). Plaintiff informed defendant Tramaine Williams and others that the white powder was sweetener from the dining hall (*id*. at ¶ 21). Defendant Ronaldo Salao performed a "presumptive" drug test on the powder (*id*. at ¶ 16). Plaintiff contends Salao falsified the drug test results at the direction of Williams (*id*. at ¶ 20). Plaintiff refused to sign a waiver of his right to have an independent laboratory test the powder and requested that a packet of sweetener be taken from the dining hall and tested using the same presumptive field kit as used by Salao on the white powder in order to prove that the test yielded false positives (*id*. at ¶¶ 22, 23). Plaintiff was placed in the administrative segregation housing unit ("ASU") on December 15 pending a drug test by California Department of Justice (*id*. at ¶ 28). On December 23, plaintiff was taken before the Inmate Classification Committee and informed that the powder found in his cell had been sent to DOJ for testing. Plaintiff contends the powder was not sent to DOJ until around January 19, 2010 (*id*. at ¶ 29).

### A. PLAINTIFF'S GRIEVANCE PROCESS

Plaintiff submitted the grievance form at issue on December 23. The form had most instructions only in Spanish whereas Mr. Gray speaks English. The following explains each step of the appeal process plaintiff allegedly undertook in order to appeal his grievance to the highest level. In his grievance, he complained "that he had been wrongfully accused of having a controlled substance, had been wrongfully placed in ASU, and request[ed] that he be let out" (*id.* at ¶ 30). In an exhibit to a sworn declaration, defendants now submit a copy of the grievance (Medina Exh. B; Foston Exh. B). Based thereon, defendants state that plaintiff submitted a grievance challenging the drug-testing process and plaintiff's placement in the ASU (Br. 12). They contend that plaintiff did not submit a grievance alleging that prison officials retaliated against him by falsifying his drug test and wrongfully placing him in ASU (Foston Decl. ¶ 8, Exh. B; Medina Decl. ¶ 11, Exh. B; *see* Br. 1).

Specifically, the grievance stated (Foston Decl. Exh. B*)*:

2

> I was placed in ASU on 12-15-09 and accused of distributing a controlled substance. After c/o's [sic] searched my cell and found a plastic bag of Artificial Sweetner [sic] (package enclosed). They claim that ISU tested it positive for methamphetamine. I explained that their test must be faulty and they should test the sweetner [sic] packs that I am talking about and they would get the same results. Proving not only that I was innocent but that their test are no good. They refused to test the sweetner [sic]. Furthermore, I asked Sgt Williamson, Cpt. Muniz, and the ICC all to verify my claim to no email.

The action requested was:

> I want ISU or anyone to test this pack of sweetner [sic] in the same fashion they tested whatever they think they found in my cell and prove I am right. And once this is done, I would like to be returned to my unit and have my status and assignment returned back its prior position. Thank you! I also want to know the test methods used.

Defendant Salao did not complete the informal response to plaintiff's grievance until January 19, 2010. In the response to the grievance, Salao stated the appeal had been "[p]artially granted" and that the item would be sent to DOJ for further testing. Plaintiff contends, however, that the "partial grant" failed to award plaintiff any of the relief he had requested; specifically, he wanted the cafeteria sweetener to be tested under the field test, which defendants refused to do (First Amd. Compl. ¶ 30).

Plaintiff pursued his next level of appeal on January 21, indicating his dissatisfaction with the informal response (*id*. at ¶ 31). Correctional Counselor J.J. Hughes completed the first formal level of review on February 16 and "partially granted" plaintiff's appeal. Again, plaintiff contended he was not awarded any of the relief he had requested (*id*. at ¶ 33).

DOJ received the powder found in plaintiff's cell on January 22 (*id.* at ¶ 32). The Inmate Classification Committee recommended a 120-day ASU assignment, pending return of the results from DOJ (*id.* at ¶ 34). Salinas Valley State Prison received the drug test results from DOJ on February 24, 2010. *The results confirmed plaintiff's claim that the substance was not a controlled substance* (*id.* at ¶ 35).

Meanwhile, plaintiff appealed to the second level of review on February 22 (*id*. at ¶ 33). On March 9, after the prison had received the drug test results from the DOJ, plaintiff received the second level appeal decision, dated February 26. It stated "the prison will take appropriate action once the test results have been received" (*id*. at ¶ 36) (Actually, the results had been received two days earlier.).

3

1 Plaintiff appealed to the third and final level of review on March 15 (*id.* at ¶ 37). Plaintiff 2 was eventually released from the ASU on April 1 (*id.* at ¶ 35). The appeal was eventually decided 3 on June 9, incorrectly stating "the inmate is being appropriately retained in the ASU pending the 4 DOJ laboratory results" (*id.* at ¶ 37).

### B. CONDITIONS IN THE ASU AND THE GENERAL POPULATION

Plaintiff alleges "[l]ife in ASU is drastically different from life in the prison's general population." Inmates in the general population are allowed two hours of yard time, seven days a week, in a large outdoor area, where they can socialize. Inmates in the ASU are only allowed three yard visits per week in an outdoor "cage" approximately five feet by nine feet. Cage visits are about the only times ASU inmates are permitted to leave their cells (*id.* at ¶ 24). While in general population, plaintiff was permitted daily hot showers, but in ASU, he was only allowed three cold showers per week (*id.* at ¶ 25). Plaintiff alleges that the ASU cells are cold and that "inmates are not permitted to wear sweats as they are in the general population." ASU cells are "appreciably smaller" than general population cells (*id.* at ¶ 27). Plaintiff also alleges that his access to legal research was "severely curtailed" in the ASU and that he was only permitted two, ninety-minute visits to the ASU law library, despite repeated requests (*id.* at ¶ 26).

Plaintiff further contends ASU inmates are "denied any opportunity to interact, socialize, or communicate with other inmates," "lose other privileges," and are "denied access to any educational or vocational programs, . . . contact visits, and . . . phone access" (*id.* at ¶¶ 24, 25).

Plaintiff claims that defendants retaliated against him for his use of the prison grievance system and that defendants violated his right to due process by denying him a meaningful opportunity to be heard concerning this deprivation of liberty.

### ANALYSIS

### A. EXHAUSTION REQUIREMENT

The Prison Litigation Reform Act states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. 1997e(a). Compliance with the exhaustion requirement is mandatory. The

4

administrative remedies need not be "plain, speedy, and effective." *Porter v. Nussle*, 534 U.S. 516, 524 (2002). Compliance with prison grievance procedures is required by the PLRA to "properly exhaust." *Jones v. Bock*, 549 U.S. 199, 217–18 (2007).

California provides its inmates and parolees the right to appeal administratively "any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare." In order to exhaust available remedies within the system, an inmate was required to proceed through: (1) informal resolution; (2) formal written appeal; (3) second appeal to the institution head or designee; and (4) third level appeal to the Director of the California Department of Corrections and Rehabilitation. 15 Cal. Code Regs. §§ 3084.1(a), 3084.5 (2009). The 2009 edition of the rules were in effect at time of plaintiff's grievance.

Nonexhaustion under Section 1997e(a) is an affirmative defense. It should be treated as a matter of abatement and brought in an "unenumerated Rule 12(b) motion rather than a motion for summary judgment." In deciding a motion to dismiss for failure to exhaust administrative remedies under Section 1997e(a), the court may look beyond the pleadings and decide disputed issues of fact. If the inmate has not exhausted the prison's administrative process, the proper remedy is dismissal without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1119–20 (2003).

Defendants evidently agree that plaintiff filed the grievance described above through the highest available level of administrative review and that plaintiff properly exhausted his *due process* claim (Br. 12, 13). They contend, however, that the grievance did not exhaust his *retaliation* claim. Plaintiff asserts that his grievance alerted defendants to the underlying wrong for which he now seeks redress.

The level of detail required in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, not the PLRA's, that define the boundaries of proper exhaustion. *Jones*, 549 U.S. at 218. The California Code of Regulations provides procedural requirements that inmates must follow when submitting appeals through the CDCR's administrative grievance process. 15 Cal. Code Regs §§ 3084.1–3084.6. As to content, the regulations only instruct the inmate to "describe the problem and action requested." *Id.* at § 3084.2(a). Where the prison grievance procedures do not indicate the requisite level of

5

factual specificity required, a grievance shall be properly exhausted if it "alerts the prison to the nature of the wrong for which redress is sought." *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009). Moreover, an "inmate must first present a complaint at the first level of the administrative process." *Sapp v. Kimbrell*, 623 F.3d 813, 825 (9th Cir. 2010); *see* 15 Cal. Code Regs § 3084.5. The question here is whether plaintiff's grievance was sufficient to alert the defendants to the nature of the wrong for which plaintiff seeks redress.

Plaintiff alleges "[d]efendants retaliated against [him] for his use of the prison grievance system by causing him to be confined to the . . . ASU . . . for over 100 days" (First Amd. Compl. ¶ 3). His grievance, however, did not specifically allege that prison officials *retaliated* against him for filing prior administrative grievances by falsifying the presumptive drug test and using the false test results as an excuse to place him in the ASU (Foston Decl. ¶ 8, Exh. B; Medina Decl. ¶ 11, Exh. B). Nonetheless, plaintiff steadfastly insisted and requested that the field test be applied to the cafeteria sweetener so that it would be revealed as a false test. Throughout the grievance process, defendants steadfastly refused to do this, eventually deciding only to have the powder found in his cell tested by the DOJ. (Even today, defendants still have refused to vet the field test against the cafeteria sweetener.) Plaintiff's grievance then took exception to the delay in the DOJ testing process. At one stage, plaintiff wrote "they are avoiding the truth because they know what the results will be" and that meanwhile he was "still in the ASU." His last written comment was that the "officers overcharged this offense just to send me to administrative segregation" (Foston Decl. Exh. B).

While it is true that the word "retaliate" was never in the grievance, the charge of a falsified and bogus field test was plainly suggested as was an alleged motivation to drag out the process to keep him in the ASU as long as possible. This was enough to raise the question whether plaintiff was being retaliated against for something, if not specifically for having exercised First Amendment rights. Given this, and given that the form and its instructions were mainly in a language unknown to plaintiff, this order holds that plaintiff adequately raised the retaliation claims in the grievance process.

6

### B. FAILURE TO STATE A CLAIM

Defendants contend that even if plaintiff's claims are exhausted — they do not contest that plaintiff's Fourteenth Amendment claim is exhausted — both claims fail under FRCP 12(b)(6) (Br. at 2).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. FRCP 12(b)(6); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that the defendants are liable for the misconduct alleged. While a court "must take all of the factual allegations in the complaint as true," it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1949–50 (quoting *Bell Atl. Corp. v.Twombly*, 550 U.S. 544, 555 (2007)). "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

To state a claim under Section 1983, a plaintiff must allege that a right secured by the Constitution or laws of the United States was violated and that the violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

#### 1. First Amendment Retaliation Claim

Defendants argue that plaintiff's retaliation claim must be dismissed because it does not state a First Amendment claim.

> Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

A prisoner must at least allege that he suffered harm, since harm that is more than minimal will almost always have a chilling effect. But, plaintiff need not show that his speech was chilled, only that retaliatory action "would chill or silence a person of ordinary firmness from future First Amendment activities." *Rhodes v. Robinson*, 408 F.3d 559, 566–68 & n.11 (9th Cir. 2005) (footnote omitted).

Plaintiff alleges facts sufficient to survive a motion to dismiss his retaliation claim. Plaintiff's complaint alleges that defendants, who are state employees, falsified the drug test in order to be able to justify his placement in ASU and that they did so in retaliation for his prior exercise of rights under the prison grievance system. Plaintiff also alleges the harms he suffered from being placed in the ASU for over three and a half months (First Amd. Compl. ¶¶ 20, 24–27, 30, 40–44). Thus, defendants' motion to dismiss plaintiff's retaliation claim is **DENIED**.

### 2. Fourteenth Amendment Due Process Claim

The issue is whether plaintiff states sufficient factual allegations to create a plausible inference that the defendants violated his due process rights. A plaintiff alleging a due process violation must demonstrate that he was deprived of a protectable liberty interest by the state and that the procedures attending the deprivation were constitutionally insufficient. *Wilkinson v. Austin*, 545 U.S. 209, 221–22 (2005). A "liberty interest may arise from the Due Process Clause or be created by state law." *Smith v. Noonan*, 992 F.2d 987, 989 (9th Cir. 1993). Our court of appeals has held that the "Constitution provides no liberty interest to be free from ad-seg." *Ibid*. Thus plaintiff must state sufficient factual allegations to create a plausible inference that defendants deprived him of a state-created protectable liberty interest.

In *Sandin v. Connor*, the Supreme Court, abandoned earlier case law which held that states created protectable liberty interests through mandatory language in prison regulations. 515 U.S. 472, 483–84 (1995). Adopting a different approach, the Supreme Court held that state law creates a protectable liberty interest for inmates under the Fourteenth Amendment Due Process Clause when the deprivation in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 482, 484.

In *Sandin*, the Supreme Court determined that the plaintiff there possessed no liberty interest in avoiding disciplinary segregation because: (1) disciplinary segregation was essentially the same as discretionary forms of segregation; (2) a comparison between the plaintiff's confinement and conditions in the general population showed that the plaintiff suffered no "major disruption in his environment;" and (3) the length of the plaintiff's sentence was not affected. *Id*. at 486–87.

8

1    Our court of appeals "explicitly has found that administrative segregation falls within the
2 terms of confinement ordinarily contemplated by a sentence." *May v. Baldwin*, 109 F.3d 557, 565
3 (9th Cir. 1997) (citing *Toussaint v. McCarthy*, 801 F.2d 1080, 1091–92 (9th Cir.1986), *abrogated*
4 *on other grounds by Sandin*, 515 U.S. 472 ("A liberty interest does not arise even when
5 administrative segregation imposes severe hardships, such as denial of access to vocational,
6 educational, recreational, and rehabilitative programs, restrictions on exercise, and confinement to
7 [one's] cell for lengthy periods of time.")).

8    Plaintiff alleges that he has a protectable liberty interest in not being placed in the ASU, that
9 is, in staying in the general population rather than being confined in a jail within a jail. He alleges
10 numerous differences between the conditions in the ASU and those in the general population: (1)
11 ASU inmates were allowed three yard visits per week, whereas the general population is permitted
12 seven; (2) the ASU yard was five feet by nine feet "cage" and enclosed by wire mesh, whereas the
13 general population yard was a "large, open, outdoor area;" (3) ASU inmates were permitted three
14 cold showers a week, whereas general population inmates were permitted daily hot showers; (4)
15 ASU inmates were denied Chapstick, and plaintiff's "lips often bled in the dry environs of Salinas
16 Valley, whereas general population inmates were not denied Chapstick; (5) ASU inmates were not
17 permitted to wear "sweats," whereas general population inmates were; (6) ASU inmates were only
18 permitted to socialize with their cellmates, whereas inmates in the general population were
19 permitted "to interact, socialize, or communicate with other inmates;" (7) ASU inmates lost several
20 other privileges and were denied access to educational or vocational programs, contact visits, phone
21 access; (8) ASU law library contained fewer books than the general population library, had no
22 chairs in which to sit, was enclosed in wire mesh, and plaintiff was only permitted two, ninety-
23 minute visits during his time in ASU, despite repeated request; (9) ASU cells are "appreciably
24 smaller than general population cells;" and (10) ASU cells are cold (First Amd. Compl. ¶¶ 24, 25,
25 26, 27).

26    The complaint alleges enough plausibly to show an "atypical and significant hardship at the
27 pleading stage. At trial or summary judgment, a more complete record will be available to assess
28

9

1  the precise contours of the liberty interest. But enough severity has been alleged to allow the issue
2  to go forward to be determined on the merits in the usual way.

3  The next inquiry is to determine what process plaintiff was due. Due process requires "an
4  opportunity to be heard . . . in a meaningful manner." *Matthew v. Eldridge*, 424 U.S. 319, 333
5  (1976). Our court of appeals has "not defined what a meaningful opportunity entails." *Castro v.*
6  *Terhune*, 2010 WL 234910 * 9 (N.D. Cal. 2010). The Supreme Court, however, has held that the
7  level of process due inmates placed in segregated housing for disciplinary reasons *includes* some
8  notice of charges and an opportunity to be heard. *Hewitt v. Helms*, 459 U.S. 460, 476 (1983),
9  *abrogated on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995) (emphasis added).

10 Plaintiff pleads facts sufficient to draw a reasonable inference that defendants' actions
11 prevented plaintiff from receiving meaningful due process before he was stripped of his liberty
12 interest (*see* First. Amd. Compl. ¶¶ 20, 29, 30, 32, 35, 36 37).

13 Indulging in all inferences favorable to plaintiff as we are now required to do, the complaint
14 alleges sufficient facts to state a claim for relief on the due process issue. Put differently, the
15 complaint alleges enough that the Court is not willing to say that it is implausible that after hearing
16 all the facts at trial or on summary judgment that plaintiff was denied the process he was due.
17 Defendants' motion to dismiss plaintiff's due process claim is **DENIED.**

18 **C. QUALIFIED IMMUNITY**

19 Defendants assert qualified immunity as to both of plaintiff's claims. A determination as to
20 an officer's entitlement to qualified immunity involves a two-pronged inquiry. First, a
21 determination whether the factual allegation, viewed in the light most favorable to the plaintiff,
22 demonstrates that the defendants' conduct violated a constitutional right. Second, if there was a
23 constitutional right, a determination whether the right was clearly established. "The relevant
24 dispositive inquiry in determining whether a right is clearly established is whether it would be clear
25 to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v.*
26 *Katz*, 533 U.S. 194, 201, 202 (2001). While the "sequence forth [in *Saucier*] is often appropriate, it
27 should no longer be mandatory." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

28

Defendants assert qualified immunity as to both of plaintiff's claims arguing that "it would not have been clear to a reasonable prison official that they violated [plaintiff's] constitutional rights by following CDCR regulations governing cell search, drug testing, and segregation" (Br. 23). But, as plaintiff contends, it has long been clearly established that retaliating against a prisoner for his use of the prison grievance system violates a prisoner's constitutional rights. *Rhodes*, 408 F.3d at 567; *see Pratt v Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (stating the "prohibition against retaliatory punishment is "clearly established law" in the Ninth Circuit, for qualified immunity purposes"). Thus, defendants are not entitled to qualified immunity on plaintiff's retaliation claim.

Turning to the due process claim, defendants rely on the same argument for asserting their entitlement to qualified immunity. Plaintiff contends that "any reasonable prison official would know that fabricating evidence for use against an inmate in a criminal proceeding or to undermine the validity of an administrative hearing violates the law" (Opp. 18). Because it was clearly established at the time of defendants' actions that defendants were not allowed to falsify evidence, as is alleged in the complaint, and use it against plaintiff, as he alleged they did, defendants' are not entitled to qualified immunity on this claim.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is **DENIED**.

**IT IS SO ORDERED.**

Dated: September 9, 2011.   _____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE